**Francis SKAW, et al.**

v.

**The UNITED STATES.**

No. 79–79L.

United States Claims Court.

July 30, 1987.

8

Thomas W. Frizzell, Missoula, Mont., attorney of record for plaintiffs. Richard R. Buley and Tipp, Hoven, Skjelset & Frizzell, of counsel.

Jean A. Kingrey, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II, for defendant.

## OPINION

HARKINS, Senior Judge:

Plaintiffs, who collectively represent the ownership interests in 15 unpatented placer mining claims in the St. Joe National Forest, Idaho, filed a petition in the Court of Claims on March 5, 1979, that alleged inclusion of the St. Joe River on November 10, 1978, by Section 708 of Pub.L. No. 95–625 (codified at 16 U.S.C. § 1274(a)(23) (1982)) as a component of the national wild and scenic rivers system effected a taking of property rights secured under the mining laws. Plaintiffs sought $10 million as just compensation.

Disposition of plaintiffs' claims has been delayed by procedural complications. In order to ascertain the extent and value of any property rights plaintiffs possessed as of November 10, 1978, on defendant's motion, court proceedings were stayed from August 22, 1979, to June 30, 1982, to permit the Secretary of the Interior to determine the validity of plaintiffs' mining claims in administrative contest proceedings. During the stay, an administrative complaint was filed on January 15, 1981, that challenged the validity of the claims because of improper location and for failure of discovery of valuable mineral deposits before or after October 2, 1968, extensive discovery proceedings were undertaken, and a hearing was scheduled to begin January 18, 1982. On November 13, 1981, while the mineral contest was pending, the Idaho State Office of the Bureau of Land Management (BLM) declared the claims were abandoned and void because of plaintiffs' failure to file evidence of assessment work or notice of intention to hold the claims before December 30, 1980. In view of this determination, the mining contest proceedings were dismissed on November 19, 1981, without prejudice to either party. The dismissal left unresolved the allegation that plaintiffs' claims were invalid for lack of discovery. Plaintiffs did not appeal the dismissal, but did appeal to the Interior Board of Land Appeals (IBLA) the November 13, 1981, declaration of abandonment. On April 19, 1982, the IBLA affirmed the decision, dismissed the appeal and stated that the United States Court of Claims is being advised that the Department of the Interior "now considers the claims to be abandoned and void."

The stay in the Court of Claims was lifted on June 30, 1982. On October 1, 1982, the case was transferred to the United States Claims Court pursuant to Section 403(d) of the Federal Courts Improvement Act of 1982. 28 U.S.C. § 171, note (1982). Defendant filed its answer on October 1, 1982, and on February 4, 1983, filed a motion for summary judgment that asserted plaintiffs had abandoned any property in-

terest in the claims, that Section 708 did not constitute a legislative taking, and, in the alternative, requested remand to the Department of the Interior to determine the validity of the claims as of the alleged taking date. On July 6, 1983, defendant's motion for summary judgment was allowed, and the complaint was dismissed. Initially, it was held that defendant was entitled to judgment as a matter of law on the ground that plaintiffs' placer claims were invalid for lack of discovery of valuable mineral deposits. Alternatively, it was held that if it were assumed that the placer mining claims were valid as of November 10, 1978, enactment of Section 708 to include the St. Joe River as a component of the national wild and scenic rivers system did not amount to a legislative taking, and that plaintiffs could not show governmental action that would constitute an inverse condemnation of their claims. *Skaw v. United States*, 2 Cl.Ct. 795 (1983). On appeal, the Federal Circuit vacated the judgment and remanded the case for further proceedings. 740 F.2d 932 (Fed.Cir. 1984). The remand directed a trial in the Claims Court to determine the validity of plaintiffs' unpatented mining claims, and to resolve the following factual issues:

    a. Which of the claims, in whole or in part, fall within the definition of beds and banks as referred to in Public Law 95–625, Sec. 708?

    b. Can the Plaintiffs' alleged unpatented mining claims be mined by methods other than placer or dredge mining methods?

    c. If there was only a portion of the claims taken, can the remainder be mined or is there in effect a taking of the whole by taking of part?

Trial was held August 13, 1985, through September 2, 1985. Plaintiffs called 16 witnesses, four of whom were qualified as experts; defendant called nine witnesses, two of whom were qualified as experts. Posttrial briefing was completed on May 1, 1986. For the reasons that follow, plaintiffs have failed to prove that they had valid mining claims by reason of the discovery of a valuable mineral deposit within the limits of the claims.

## FACTS

1. (a) Plaintiffs assert they collectively represent all ownership interests in certain unpatented placer mineral claims in the St. Joe National Forest, Shoshone County, Idaho. Two sets of claims, Ruby Nos. 1 through 6, and Ruby Nos. 10 through 15, and Joe Nos. 1 through 6 and 8 through 10, sequentially cover all of the banks and beds of the St. Joe River from Spruce Tree Campground to Heller Creek.

(b) Four groups assert an ownership interest in the claims: (1) Shelton group, (2) Click group, (3) Skaw group, and (4) Tipp-Hoven. The Shelton group interest is traced to records relative to Ruby Nos. 1 through 6 filed June 19, 1953, in the Shoshone County Courthouse, and to records on Ruby Nos. 10 through 15 filed on September 25, 1961, and on July 6, 1964. The Click group and the Skaw group interests are traced to deeds dated April 18, 1961, relative to transfers of ⅛ interests in Ruby Nos. 1 through 6, to records on Ruby Nos. 10 through 15, filed on September 25, 1961, and on July 6, 1964, and to records on Joe Nos. 1 through 6 filed on December 18, 1961, and on Joe Nos. 8 through 10 filed on September 24, 1962. The records in evidence concerning the interests of the family groups qualify the plaintiffs named in the complaint to be parties under RUSCC 17. The chain of title is incomplete as to various plaintiffs. The legal effect of the relevant records and documents in evidence as to the validity and allocation of rights of particular plaintiffs, or other claimants, has not been litigated and is not determined in this case.

(c) By quitclaim deeds dated July 31, 1973, representatives of the ownership interest transferred an undivided ⅛th ownership interest in Ruby Nos. 1 through 6 and Ruby Nos. 10 through 15 to Vernon Hoven and Raymond P. Tipp. By quitclaim deed dated August 1, 1973, representatives of the ownership interest transferred an undivided ⅛th ownership interest in Joe Nos. 1 through 9 to Vernon Hoven and Raymond P. Tipp.

(d) By agreements dated March 15, 1974, Leo Hurley & Associates entered leases and option agreements for Ruby Nos. 1 through 6 and Ruby Nos. 10 through 15, and Joe Nos. 1 through 9 looking toward exploration and production on the placer mining claims. Leo Hurley & Associates is a general partnership with Leo Hurley and Vernon Hoven as equal partners. Vernon Hoven is deceased. One half of Vernon Hoven's interest in Leo Hurley & Associates was transferred by assignment to Raymond P. Tipp.

(e) By agreement dated August 4, 1977, by representatives of holders of the ownership interest and by an agreement filed by the First State Bank of Stevensville as escrow agent, division of any awards in this case will give the owner-lessors 15 percent of the first $750,000 and 25 percent of any amount over $750,000. These amounts are to be divided into four equal parts, which are to be paid to the three family groups and to Hoven-Tipp. Leo Hurley & Associates receive 85 percent of the first $750,000 and 75 percent of any amounts over $750,000. This part of the award will be divided one half to Leo Hurley, with the remaining one half to be divided between Raymond P. Tipp and Vernon Hoven's heir.

2. (a) Plaintiffs' placer mining claims involve lands along the approximately 35 miles of the St. Joe River between Spruce Tree Campground and Heller Creek. The record contains four placer location notices filed on the Ruby claims: June 19, 1953, September 25, 1961, July 7, 1964, and April 26, 1976. Three placer location notices were filed on the Joe claims: December 18, 1961, September 24, 1962, and October 6, 1976. The notices followed standard forms, generally named eight individuals as locators, purported to describe tracts that total 160 acres, and alleged satisfaction of sampling requirements. Some notices described the location by natural monuments or objects, such as "follows the contour of the St. Joe River", other notices recited the required corners were marked by posts or monumentation. Descriptions on the face of notices, as well as markings in the field, reflect an intent to claim placer gravels in

the lands that straddle the river in the St. Joe River canyon.

(b) The dimensions and locations of the claims were described variously by reference to township, section and range or by metes and bounds. The descriptions on the faces of the notices do not accurately identify the ground claimed, frequently do not describe complete, regular or contiguous tracts, and include lands that previously had been withdrawn from appropriation. The Forest Service in 1976 and 1979 was unable to locate the claim corners or to locate the claims on the ground from monuments found during the searches. Descriptions for the amended Ruby Nos. 10 through 15 (filed July 7, 1964) and the original Joe Nos. 1 through 6 and 8 through 10 (filed Dec. 18, 1961, and Sept. 24, 1962) and the descriptions of Ruby Nos. 1 through 6 and Joe Nos. 1 through 6 and 8 through 10 in the 1976 filings (and in the complaint in this case) can be plotted in a manner that accords with the intent to straddle the river and claim placer gravels in the river canyon.

3. (a) The 1953 Ruby placer mining claims Nos. 1 through 6 refer to 27 tracts described by township, section, and range. The claims were stated to "follow the contour of the St. Joe River, in a North and South direction and a East and West Direction." The claims were located for gold. They were marked during the period May 11, 1953, through May 20, 1953, and the notices were filed with the Shoshone County Clerk and Recorder on June 19, 1953. The locators of the 1953 Ruby claims marked the corners by squaring trees and posting notices of location in coffee or tobacco cans on the trees.

(b) Ruby claims Nos. 10 through 15 refer to lands in the same general area as the 1953 locations. The six tracts are described by metes and bounds. Ruby Nos. 10, 11 and 12 were marked on August 26, 1961, and Nos. 13, 14 and 15 were marked on September 2, 1961. The notices were filed with the Shoshone County Clerk and Recorder by James R. Maynard, President and General Manager of Continental Rare Metals, Inc. on September 25, 1961. Eight

individuals were listed on the standard form as "Locators". The listed "Locators" included James Click and Francis Skaw. Each location notice contained an affidavit signed by James R. Maynard as agent for the "Locators" that included the following:

I.... solemnly swear that I am acquainted with the mining ground described in the notice of location ... and that the ground and claim therein described, or any part thereof, has not, to the best of my knowledge and belief, been heretofore located according to the laws of the United States and of this State, or, if so located, that the same has been abandoned or forfeited by reason of the failure of such former locators to comply in respect thereto, with the requirements of said laws, and that I have made an excavation upon said claim of not less than one hundred (100) cubic feet, for the purpose of prospecting the same, as required by the laws of the State of Idaho.

When plotted by the Forest Service, the metes and bounds set forth on the 1961 notices for Ruby Nos. 10 through 15 were not contiguous and did not apply to the St. Joe River canyon.

(c) Amended placer location notices for Ruby Nos. 10 through 15 were marked on June 29, 1964, and the amendments were filed with the Shoshone County Clerk and Recorder by James Click on July 7, 1964. On the form, the words "Located" and "Locators" were crossed through and replaced by the words "Amended" and "Amendors". The eight individuals listed as "Amendors" included James Click, Sr. and Francis Skaw. The amended Ruby Nos. 10 through 15 described different lands, which when plotted by the Forest Service depicted contiguous tracts that straddled the St. Joe River and encompass bottomland of gravel deposits. The location notices, in addition to a metes and bounds description, included "The contiguous claims ... running in a southerly direction along the course of the St. Joe River". The notices contained an affidavit signed by James Click, Sr., that included the same representation as in the affidavit

executed by James Maynard in the 1961 filings.

(d) On March 29, 1976, James Click Sr., Francis Skaw and Kenneth Shelton executed amended location notices for Ruby Nos. 1 through 6. The amended notices were filed with the Shoshone County Clerk and Recorder on April 26, 1976. The amended notices described the lands by township, section, and range and recited that the amended location is made "in conformity with the original location" made during May 1953 and recorded June 19, 1953, and "it is made for the purpose of appropriating all ground within the boundaries hereinbefore described, and of more definitely describing the situation and boundaries of said claim, correcting any irregularities, informalities or errors which may exist in the original location, or the record therefrom." The amended notices contained affidavits signed by Francis Skaw, that included substantially the same representation as in the affidavit executed by James Maynard in the 1961 filings, and by James Click, Sr., in the 1964 filing. The lands described in the 1976 amended Ruby locations differ substantially from the lands described in the 1953 filings. The 1976 amended Ruby location descriptions identify boundaries that do not coincide with the boundaries described in the 1964 amended Ruby Nos. 10 through 15 notices. The lands described, however, in large part are the same, and the differences in description are not material as to the intent of the claimants.

4. (a) Joe placer mining claims Nos. 1 through 6 are tracts on the St. Joe River described by metes and bounds, with an initial point at the northeast corner of Ruby No. 15, which is said to be approximately 6,000 feet easterly of the mouth of Ruby Creek. The claims were marked on October 20 and October 21, 1961, and were filed with the Shoshone County Clerk and Recorder by James Click on December 18, 1961. Joe placer mining claims Nos. 8 through 10 are on the St. Joe River and are described by metes and bounds. The beginning point is ambiguous in the notices, but the intent was to describe bottomlands upstream from Joe No. 6. The claims were

marked on September 22, 1962, and filed with the Shoshone County Clerk and Recorder by James Maynard on September 24, 1962. The notices for Joe Nos. 1 through 6 and 8 through 10 listed eight individuals as "Locators", who included James Click, Sr. and Francis Skaw. Each notice contained an affidavit executed by James Click which included the same representation as that in the 1961 Ruby filings, i.e., that no part of the claims had been previously located according to law, "or if so located, that the same has been abandoned or forfeited by reason of the failure of such former locators to comply in respect thereto, with the requirements of said laws." The affidavits also contained the representation that an excavation of no less than one hundred cubic feet had been made for purposes of prospecting the claims.

(b) On September 25, 1976, Francis Skaw and James Click, Sr. executed amended location notices for placer claims Joe Nos. 1 through 6 and Nos. 8 through 10. The amended notices filed with the Shoshone County Clerk and Recorder on October 6, 1976, described the lands by township, section and range. The notices recited that amended locations were made "in conformity with the original location" recorded December 18, 1961, and September 24, 1962, and are "made for the purpose of appropriating all ground within the boundaries hereinbefore described, and of more definitely describing the situation and boundaries of said claims, correcting any irregularities, informalities or errors which may exist in the original location, or the record thereof ..." The amended notices contained affidavits executed by Francis Skaw and James Click, Sr. that contain the same representations as the affidavits that were contained in the 1961 and 1962 filings.

5. (a) The lands claimed in the 1961 notices for Ruby Nos. 10 through 15 were intended to include the same placer deposits that were identified in the 1953 notices on Ruby Nos. 1 through 6. The 1953 notices were locations for gold, and the descriptions were ambiguous. The 1961 filings were made in connection with the activities of a lessee who wanted to mind the

deposits for garnets. The claimants were helped by James Maynard, president and general manager of the lessee, who filed the notices and signed the affidavit, as agent and lessee of the claimants, that all conflicting claims had been abandoned or forfeited. This affidavit is required with the filing of an original location. The 1961 notices involved more than amendments to change the tract descriptions. The claims were renumbered and any limitation as to the gold was removed. Little effort was made in the 1961 Ruby filings to delineate tract dimensions with any degree of accuracy. When plotted by the Forest Service, the tracts as described did not follow the course of the St. Joe River.

(b) Gold and garnet are minerals that may be located and appropriated under the public land laws. Placer gravels covered by the Ruby claims and the Joe claims contain some amounts of gold. Garnet is found in connection with the gravels covered by the Ruby claims; there is little garnet above Ruby Creek or on the Joe claims. On Ruby No. 6 (1976 description) and on all of the Joe claims there is insufficient garnet to mine commercially for that mineral. Gold deposits in the placer gravels on the Ruby and Joe claims are not uniform; the gold deposit is not concentrated at bed rock. Gold values are erratically distributed throughout the gravels and due to the nature of the stratification, mineralization does not increase at depth in the gravels.

(c) On December 2, 1950, Public Land Order (P.L.O.) 694 withdrew from all forms of appropriation under the public land laws, including the mining laws, the Red Ives administrative site in the St. Joe National Forest. On September 26, 1955, P.L.O. 1227 withdrew additional tracts in the St. Joe National Forest for the Red Ives administrative site, Spruce Tree Campground, and for other areas. Some of plaintiffs' Ruby and Joe notices claim lands that had been withdrawn under P.L.O. 694 and 1227 prior to marking and filing by plaintiffs. Such areas are found in Ruby Nos. 1, 2 and 5, and Joe Nos. 2, 3 and 4 as described in the complaint and in the 1976 amended location notices. Plaintiffs assert no

claims as to lands withdrawn by P.L.O. 694 and 1227.

(d) The St. Joe River in Idaho, and the land adjacent thereto, was designated as a component of the National Wild and Scenic Rivers system on November 10, 1978. The segment of the St. Joe River above Spruce Tree Campground to St. Joe Lake, which contains the subject claims, was designated as a "wild river". 16 U.S.C. § 1274(a)(23) (1982).

(e) Subject to valid existing rights, the minerals in any Federal lands which constitute the bed or bank or are situated within one quarter mile of the bank of the St. Joe River, if not already previously withdrawn, were and continue to be withdrawn from all forms of appropriation under the mining laws as of October 2, 1968. 16 U.S.C. §§ 1279–80 (1982). Discovery of valuable mineral deposits must be shown within the boundaries of each mining claim, or properly located portions thereto, as of October 2, 1968, the date of withdrawal by the Wild and Scenic Rivers Act, and again as of the date of any taking.

6. (a) The locators of the 1953 Ruby claims dug location pits on all of the claims, marked the corners or monumented the claims by posting notices, and engaged in exploratory panning to sample the gravels. The activities of the original locators established the presence of gold and garnet, but were not adequate to determine quantity or value of the minerals.

(b) During the 1950's the original locators leased the Ruby claims first to a Mr. Pringle and then to a Mr. Tyler. No evidence was introduced regarding the results of any sampling or other exploratory work done by these lessees. Both leases were terminated for failure to develop the property.

7. (a) In 1961, the original locators leased the Ruby claims to Continental Rare Metals (CRM). CRM's general manager was James Maynard, who was experienced in mineral exploration and mining, and who supervised the work on the Ruby claims done by CRM. Mr. Maynard helped with the filing in 1961 of Ruby Nos. 10 through 15. CRM contracted with E.B. Weiss, who in 1962 churn drilled a total of nine holes in an exploratory program: one at Spruce Tree Campground (Ruby No. 1 (1976)), six on Scat Creek bar, and two upstream by Timber Creek (Ruby No. 3 (1976)). All the holes were drilled to bed rock. No credible evidence is in the record relative to the drilling results from the 1962 CRM churn drilling exploratory program. CRM conducted other tests upstream, panning samples dug with a shovel or backhoe. Gold and garnet were found. There is no credible evidence as to mineral values as a result of these tests. In 1961, CRM investigated the market for garnet, and concluded there was a considerable market for raw garnet for sandblasting and other uses.

(b) In 1962, CRM constructed a road from Color Creek to Scat Creek bar, moved equipment to construct a dredge, and in March 1963, constructed a dredge at Scat Creek bar. One acre was dredged; 2½ acres were cleared. The dredge was operated by E.B. Weiss. Approximately 50 cubic yards were processed, and 50 tons of garnet samples were shipped to one company. Other companies expressed an interest in CRM garnet production, and one company indicated it was willing to purchase a minimum of 7,000 tons of garnet per year, unsorted and unsized. CRM, however, was unable to negotiate a sales contract, and no garnet purchases ever occurred.

(c) In September 1964, a complaint was filed against CRM for violation of the Securities Act, and in 1965, CRM was permanently enjoined from the sale of stock until registered with the SEC. CRM did no dredging in 1964 or in any subsequent year, and never got into commercial production. In April 1967, CRM's lease was terminated because of failure to get into production of garnet in the 1966 season.

8. (a) In late 1967, plaintiffs leased on a royalty basis the Ruby claims to Mr. Doolin and the Idaho Mining Company of Texas (IMCT). IMCT was a partnership organized in 1966 or early 1967 by Gene W. Nelson, William Doolin and Charles Kirkham; Mr. Nelson contributed $125,000 to the enterprise, Mr. Doolin contributed approximately $25,000 and Mr. Kirkham con-

tributed $15,000. Mr. Nelson had no mining experience. He was president of Gene Nelson International, which since 1947 was a concern engaged in tank linings, coatings, sandblasting and abrasives. Before acquiring leases on the Ruby claims, IMCT had acquired leases on a royalty basis on garnet claims on Mosquito Creek from a Mr. Stewart. The cash investments in IMCT were made prior to acquisition of the leases on the Mosquito Creek claims.

(b) In connection with development of the Mosquito Creek claims, IMCT leased space in 1967 at the railhead at St. Regis, Montana and bought equipment for mining and for sizing and bagging at the railhead. The equipment was shipped from the manufacturer on May 16, 1967, and billed to Mr. Doolin on May 30, 1967.

(c) IMCT never got access to the claims on Mosquito Creek, and after failure to get access acquired the lease to the Ruby claims. IMCT applied to the Forest Service for a permit to haul over the road to Scat Creek bar, and applied to the State of Idaho for a dredge mining permit. A hearing was held on the Idaho dredge mining permit on February 2, 1968. At the State Land Board hearing, the Forest Service submitted a statement on the impact of the proposed dredging operation on the uses and resources along the upper St. Joe River on national forest land. The statement declared that, if dredging proved successful, ultimately up to 30 miles of river bottom would be damaged and susceptible to periodic channel changes, that a complex system of gabions, letdowns, and bank protection devices would be required to maintain a single channel, and that the effects of dredge mining and the protection and use of forest resources now along the upper St. Joe River are not compatible.

(d) In Spring 1968, the Forest Service indicated the Special Use Permit would be issued when IMCT furnished the amount of ore to be hauled and an Idaho dredge mining permit was obtained. IMCT withdrew its application for a dredge mining permit and in July 1968 advised the Forest Service it had decided not to haul ore, but would only do assessment work. In late 1968, IMCT stopped all efforts to operate under the lease.

(e) IMCT was active only with respect to a possible garnet operation on Scat Creek bar (Ruby No. 3 (1976)). It never brought the property into production. IMCT did not prepare a plan of operation that established that a successful mining operation could be conducted on the garnet deposits located on Scat Creek bar.

9. (a) When IMCT leased the Ruby claims, another company, Shield Minerals Corporation (SMC), was examining the Joe claims as a potential property to mine. SMC in 1967 hired Paul Hopkins, a consulting mining geologist and engineer, to conduct a reconnaissance examination of the St. Joe River deposits to make a preliminary delineation of the placer gold potential. Burt Lindley, an employee of SMC, participated in the evaluation. The investigation began July 6, 1967. The Hopkins report was submitted July 28, 1967.

(b) Mr. Hopkins' field work included panning samples on gravel bars on Ruby Nos. 3, 4, 5 and possibly 6. Mr. Hopkins made no qualitative estimates of the pan samples, and kept no written record of his results. Mr. Hopkins also tested four samples taken by backhoe: sample Nos. 1 and 2 were from pits dug near the junction of Heller Creek (Joe No. 10 (1976)). No. 3 was taken at the ford above Broken Leg Creek (Joe No. 3 (1976)), and No. 4 was taken near the junction of Beacon Creek (Joe No. 1 (1976)). The samples were run through a modified Denver Gold Saver. Mr. Hopkins reported the following results:

### SAMPLE RESULTS

| Sample No. | Volume | Gold Recovered | Value—cents per cubic yd. |
|---|---|---|---|
| No. 1 | 3.4 cu. ft. | 65.0 mg. | 49.3 |
| No. 2 | 5.4 cu. ft. | 57.3 mg. | 27.4 |
| No. 3 | 6.8 cu. ft. | 23.0 mg. | 8.2 |
| No. 4 | 0.95 cu. ft. | 5.4 mg. | 14.7 |

NOTE:  Gold value was calculated at 850 parts gold per 1000 parts or 850 fine. Gold @ $35.00 per ounce, 1000 fine.

(c) Mr. Hopkins estimated the yardage available for mining from the junction of Heller Creek downstream to Scat Creek, including the ground where CRM operated, for gold and garnet.  His estimates were:

### ESTIMATED YARDAGE

| | |
|---|---|
| Heller Creek to Bean Creek | 2.8 million cu. yds. |
| Bean Creek to Broken Leg Creek | Not mineable with large equipment |
| Broken Leg Creek to Ruby Creek | 6.3 million cu. yds. |
| Ruby Creek to Scat Creek (not leased) | 3.3 million cu. yds. |

NOTE:  Additional yardage may be found if the depth of the gravel is found to be more than 20 feet deep.

(d) Mr. Hopkins recommended a preliminary exploration program.  He submitted the following recommendations:

1. In view of the limited potential, i.e., 6.3 million cubic yards, in the primary area between Broken Leg Creek and Ruby Creek, the writer can recommend the property as suitable for consideration using a "stacker-scow" or "bucket dredge" with a daily capacity of 3,000 to 5,000 cubic yards per day.  The period of operation will be limited by the weather to about 7 months per year.  Based upon the estimated yardages, the predicted life of the operation is from 6 to 10 years.

2. If the limited objective potential in paragraph 1 above is acceptable, the economics of the property must be determined.  This determination requires a drilling program of not less than one month with the option to continue as the field results are evaluated.  Considerable preliminary planning must be part of and precede the drilling program.  Many of the initial steps in this program have been taken that will expedite further exploration.

Mr. Hopkins did not set up a drilling program.  He submitted a preliminary budget for a preliminary exploration that totaled $154,307.50.  Shield Minerals did not lease the property.

10.  (a) Leo Hurley, in connection with a program to set up a natural resources subsidiary for LTV Aerospace Corp., became interested in the Ruby and Joe claims as a result of contacts with Mr. Doolin of IMCT. Mr. Hurley had H.B. Renfro conduct a field examination of the garnet deposits on the claims.  The field examination, made in late 1968, and reported on January 6, 1969, included Ruby Nos. 1 through 6, 10 through 15, and Joe Nos. 1 through 6, 8, and 9 as shown in public records at that time.  The report states: (1) that the garnets vary from less than 200 mesh up to the size of small gravel particles, (2) that

the garnet is present continuously in gravel bars over a distance of several miles along the St. Joe River and appears to be a very, very large deposit, and (3) that traces of gold have been reported in analyses. The report concludes that, if a market exists for this type of garnet, the deposit would be very worthwhile. The report recommends further investigation and states that preparation of estimates of quantities of garnet available can be done at the beginning of the field season in 1969.

(b) In 1969, Leo Hurley had CKC Drilling Co., Missoula, Montana (Chuck Hollensteiner, owner) churn drill six sampling holes on Scat Creek bar (Ruby No. 3 (1976)). The holes were drilled to bed rock, and three samples were taken at different depths in each of the six holes, a total of 18 samples. This drilling program was paid for by LTV Aerospace.

(c) Churn drill samples from Scat Creek bar were sent to Hazen Research, Inc. for analysis as a potential placer gold deposit. Hazen Research did a chemical and size analysis and a gravity concentration test. Fourteen samples, each weighing approximately 60 lbs., were received from Vernon Hoven on December 29, 1969. The 14 samples were contained in cloth bags, and some of the marks could not be identified. Two samples could not be properly identified. Samples from hole Nos. 1 through 5 were tentatively identified: from hole No. 1 the sample from the 0–4' level was not received; from hole No. 3, the sample from the 10–15' level was not received; from hole No. 4, the sample from the 11–17' level was not received. Samples from hole No. 6 could not be identified, but one sample marked as from the 12–14' level was attributed to hole No. 6. In the gold and silver analyses, this sample was treated as two (HRI Nos. 2695–13 and 2695–6). Hazen Research reported the following summary:

The gold content of the 14 samples ranged from 0.005 to 0.43 ounces per ton. Only four samples contained greater than 0.005 ounces of gold per ton with values of 0.11, 0.11, 0.12, and 0.43 ounces, respectively. The silver content of the samples ranged from less than 0.005 to 0.08 ounces per ton.

The three samples from Hole No. 2 were composited and single-stage table concentration tests were run on the minus 10 plus 65 mesh and minus 65 mesh fractions. The combined table concentrate from the two fractions analyzed 0.43 ounces per ton of gold and contained 83.3% of the gold in the composite sample. The concentrate represented 9.9% by weight of the composite sample. It is likely that a concentrate with a higher content could be produced by retabling the rougher concentrate.

(d) Leo Hurley concluded LTV could produce garnet from the Scat Creek bar deposit at lower costs than production from a garnet mine in Fernwood, Idaho, a potential competitor. The market for sales of garnet was investigated by contacting large national distributors and consumers, and Leo Hurley concluded that LTV could sell up to 10,000 to 15,000 tons of garnet per year. Leo Hurley proposed that LTV establish a natural resources subsidiary, and made a presentation for that purpose to LTV's Board of Directors. At that time, LTV was in financial trouble, and the decision was made not to create a natural resources subsidiary. LTV did not lease plaintiffs' claims.

11. (a) Throughout the 1960's, the Forest Service was concerned with the effect proposed mining operations would have on the St. Joe National Forest and on other users of the forest. The Forest Service basically believed dredge mining was incompatible with its other responsibilities for forest management and was negative toward efforts to undertake mining operations on the upper St. Joe River. During the 1960's, in its opposition, however, the Forest Service recognized its multiple use responsibilities in forest management and its obligations to mining claimants, did not question whether in fact a discovery had been made, and directed its challenges to infirmities in the location notices. In connection with CRM's efforts to start dredging operations on Scat Creek bar, the Forest Supervisor became concerned about the status of the withdrawals for the Red Ives administrative site that affected some of the Ruby claims,

and on September 4, 1962, requested the Regional Forester to examine the legal effect of the location notices that various claimants had filed in 1946, 1953, and 1961. In connection with the request, the Forest Supervisor stated "We are not questioning whether or not [CRM] has a valid discovery and a legal right of access and mining privileges. However, we do feel there is great discrepancy in the mining locations which should be further investigated in order to determine the status of our withdrawal."

(b) CRM's activities generated inquiries from environmental and other user organizations that opposed dredge mining in the national forest. The Forest Service responses to these inquiries routinely advised that it was concerned with the problem, that CRM was cooperating with the Forest Service, that the Forest Service was working out proper location and construction requirements for the road, and explained its responsibilities under the mining laws. In this connection, the advice was that "[CRM] presently holds the mining claims involved in this operation. They have a valid discovery and the legal right of ingress and egress under the general mining laws. Mining is one of the multiple uses of the National Forests and the Forest Service cannot interfere with a legitimate mining operation." This explanation was sent on September 10, 1962, to the Idaho Wildlife Federation, District No. 1, and to the Coeur d'Alene Wildlife Federation. On October 9, 1962, it was sent to the secretary of Coeur d'Alene Bowmen, Inc.

(c) In connection with CRM's application for a special road use permit, the Forest Supervisor on May 13, 1966, advised the District Ranger as to appropriate road maintenance charges for ore hauling. On June 27, 1966, the Forest Supervisor forwarded to CRM a special road use permit for hauling on Forest Service roads between Spruce Tree Campground and St. Regis, Montana. The road maintenance charge was $0.233/ton/mile, and required an advance deposit, or a payment bond, in the amount of $2,000.

(d) On August 22, 1967, the Forest Supervisor and Acting District Ranger met with Vernon Hoven, who at that time acted as the official spokesman for all of the mining ventures located on Red Ives Ranger District. The meeting was concerned with the affairs of mining ventures proposed in the Mosquito Creek drainage, CRM's failure to perform normal road maintenance, and the status of responsibility for maintenance of the special use road leading from Spruce Tree Campground to the Ruby Creek claims located near the mouth of Scat Creek. It was established that CRM's lease had been cancelled and that the claim holders would do the required road maintenance work. Mr. Hoven was given a list of the work which would be required. The required maintenance amounted to only a few days work, after which the claim owners planned to move in various items of heavy equipment to do their annual assessment work on the claims. In conjunction with cancellation of the CRM lease, a new special use permit was issued in the names of Francis Skaw, W.W. Shelton and James Click. At the meeting it was brought out that the area between Ruby Creek and Heller Creek would be entered only to perform the necessary annual assessment work. The Forest Supervisor emphasized that the mining claimants should first explore and develop the Ruby claims located at the end of the special use road and determine their value before moving on to the more unaccessible areas up the St. Joe River. As to mining in the Mosquito Creek drainage, the Forest Supervisor stated that the route proposed by the claimants up the mouth of Mosquito Creek absolutely would not be approved because an alternative more desirable and less costly route to the claims was available.

12. (a) In connection with the preparation of a statement for use at the hearing on the IMCT application for a dredge mining permit, the Red Ives District Ranger on March 2, 1968, prepared a multiple use survey report. This report was approved by the Forest Supervisor on April 19, 1968. The activity considered in the report was IMCT's proposed dredge mining for garnet

above the Red Ives Ranger Station. The dredging proposed concerned only Ruby claims Nos. 11 and 12 (as shown in the public records at that time), but the report noted that IMCT had leases to Ruby claims Nos. 11 through 15, and Joe claims Nos. 1 through 6, and 8 through 10.

(b) The report evaluated the effect of the dredge mining project on: potential recreation sites, and on range, timber, watershed, wildlife and fish resources. As to the effects of dredge mining on potential developed recreation sites, the report concludes:

In summary, dredging in this area would in no way be compatible with recreation use. Every effort should be made to prevent dredging as there is no question about the future need for recreation sites and public demand of the outdoor recreation facilities, while there is considerable question as to the actual value and demand for garnet sand.

As to the effect on the watershed, the report concludes dredge mining would be detrimental. "There is no economic or feasible way to protect the physical characteristics or the water quality of the St. Joe River if dredge mining occurs."

(c) In the Minerals section the report described the proposed dredging process, and stated unknown quantities of garnet sand and gold would be recovered. Mining would be done with either a dredge, dragline or endloader type of machinery, and 2 to 10 feet of overburden would have to be removed to uncover the garnet bearing sands, except in the river channel. These sands probably would be washed and the garnet separated for shipment to a cleaning and processing plant in St. Regis, Montana, a distance of 41 miles. The finished product would be shipped by rail from St. Regis.

(d) The Minerals section of the report pointed out that there is some question as to the quality of the garnet in this area and that there are problems in moving enough material to maintain economical production levels. The report noted that the economics of the market for garnet abrasives is questionable; that synthetics can be manufactured for little more than the mining cost of garnet sand, and that any undue production costs can make dredging operations marginal. In March 1968, it was known that the Sunshine Mining Company produced all the garnet it could sell even though it operated less than full time.

13. On September 23, 1968, the Red Ives District Ranger requested a mineral examination of Ruby claim Nos. 10 and 11 and of Joe claim Nos. 9 and 10 on the ground that those areas had been advertised for withdrawal by the Bureau of Land Management as a recreation withdrawal. On October 10, 1968, the Forest Supervisor forwarded requests to the Regional Forester, with a copy of the impact use report and requested an early examination because the claims were within an area proposed for withdrawal from mineral entry.

14. On October 2, 1968, the St. Joe River was designated as a "study river" in the Wild and Scenic Rivers Act. The price of gold was $38.90 per ounce. As of that date, the boundaries of the Ruby and Joe claims were not accurately located on the ground. The location notices did not describe the same areas as subsequently delineated in the 1976 filings. No evaluation had been made in depth to determine the potential market for garnet sales from production on the claims. The claims were in the exploratory stage as to both garnet and gold. Substantial amounts of testing would be required before a determination could be made to develop the claims for commercial operations. On June 1, 1974, Vernon Hoven, on behalf of the claim owners, and Leo Hurley as lease holder, explained to the Ranger at Red Ives, the need for an access road to the claims for work in summer 1974. He stated:

The purpose of the use of the access route is to transport equipment onto the existing claims for purposes of doing assessment work and likewise to make determination as to whether or not the area is capable of sustaining an economic operation. Heretofore, we have drilled certain holes and made many other tests and this we believe to be the final test that will lead us to either abandoning the claims or prosecuting them on a full-time

business basis. We of course recognize that the use of the existing road facility is temporary and for these test purposes only.

15. During the period October 2, 1968, to October 2, 1978, the St. Joe River was in the status of a study river, to determine whether it would be added to the National Wild and Scenic Rivers system. The Secretary of Agriculture was responsible for the study of the entire main stem of the St. Joe River and for preparation of a report on its suitability or nonsuitability for addition to the system. During the study period, representatives of the Bureau of Mines assisted in the collection of inventory type data relative to mineral values and in estimates of potential impact on mining activities. Throughout the study period, Forest Service personnel in the St. Joe National Forest, environmental groups, and recreational users were interested in and actively promoted designation of the St. Joe River as an addition to the system. Holders of unpatented mining claims, and other mining interests, were concerned with preventing such designation. Efforts that were designed to establish a record as to the validity and value of existing unpatented mining claims had an effect in the attempts to prevent designation of the St. Joe as a wild and scenic river. Those efforts also provided a foundation for later assertion of damages in the event the St. Joe was designated for inclusion in the system.

16. (a) At the request of the Forest Service, representatives of the Bureau of Mines in 1972 undertook a general reconnaissance of mineral deposits along the St. Joe River, including deposits on the Ruby and Joe claims. Lawrence Y. Marks, a Bureau of Mines employee located in Spokane, Washington, did field work in 1971 and 1972 for this survey. Surface samples only were taken, by hand shovel from pits 2 feet deep. Samples were taken from gravel deposits as encountered, without reference to, or attempt to locate, particular claims. An insufficient number of samples were taken for a precise determination of the grade of gold or quantity of garnet on the Joe and Ruby claims. Mr. Marks prepared a draft report, captioned "Mineral Resources of the St. Joe River Basin, Idaho."

(b) In the Marks report, placer gold content is expressed in cents per cubic yard, at a gold price of $65 per troy ounce. In 1969, garnet from Idaho placers in Benewah County sold for an average of $45 per ton. In 1972, the production and consumption of garnet in the United States was 19,000 tons. Cost of mining the gravel deposits on the St. Joe River were estimated, as of 1972, to be not less than 50 cents per cubic yard. Mr. Marks concluded that the St. Joe River gravels might average 5 percent garnet in volumes large enough to be mined economically. Some gold probably could be recovered as a by-product of garnet mining. He also concluded that mining for gold alone would not be profitable on any of the Ruby or Joe claims.

(c) The gravel deposits on the St. Joe River, including the deposit at Scat Creek bar, to Heller Creek contains approximately 6 million cubic yards. Approximately 2 million cubic yards were removed from appropriation by the 1950 withdrawals. The report assumed that one fourth of the 4 million cubic yards of gravel in the potential resource area is mineable, and concluded the total resources probably are not more than 1.4 million tons (or 1 million cubic yards) averaging 5 percent or more garnet with some gold recovered as a by-product. Gold content was expected to average less than 5 cents per cubic yard.

(d) The report noted that on Scat Creek bar, claim owners had excavated several hundred cubic yards of gravel, and drilled six churn drill holes. Two samples on Scat Creek bar taken by Mr. Marks, respectively contained 2 and 15 cents in gold per cubic yard, and 5 and 7 percent garnet by weight. The samples were of terrace gravel near the surface, not directly above bed rock. The report concluded that more than 300,000 tons of garnetiferous gravel, with some gold, was contained in the 220,000 cubic yards of material on the Scat Creek bar. The reports stated: "If this resource averages 5 percent garnet, and the garnet can be sold for $40 or more per ton, the deposit probably can be mined profitably."

(e) Mr. Marks' draft report was not issued as an official document of the Interior Department. The draft report was provided to the Forest Service. It was not issued as an official document of the Department of Agriculture. Portions of Mr. Marks' report were incorporated in the Secretary of Agriculture's report: "Study Report and Final Environmental Statement on the St. Joe River."

17. (a) Mr. Marks testified at trial that, to estimate whether the garnet deposits in the Ruby and Joe claims could support a mine, the Bureau of Mines developed a hypothetical mining program to process both garnet and gold using shaking tables that were portable. The hypothetical program compared favorably to the other garnet producer in Idaho. The Ruby garnet was found to be suitable for sandblasting. Mr. Marks made a cursory study of the garnet market and assumed they would be able to market all of the product. Mr. Marks concluded, based on a series of assumptions, that the Ruby claims could be mined profitably with a grade of 5 percent gravel as shown by the surface samples.

(b) The Western Field Operation Center, Bureau of Mines, had been requested by the Forest Service to provide a valuation of the Ruby and Joe garnet deposits. Mr. Marks, by memorandum dated June 5, 1974, suggested a reasonable price for the property if it were to be purchased by a government agency. Mr. Marks noted that his computation had not been thoroughly checked and that it was "a hasty and somewhat superficial analysis."

(c) Mr. Marks' estimate assumed: (1) 1 million cubic yards of gravel with an average of 5 percent garnet is available; (2) that raw garnet concentrate would sell for $50 per ton or more; (3) that garnet is of similar quality to that being mined on Emerald Creek near Fernwood, Idaho; and (4) that the property could not be mined in less than 15 years without reducing efficiency significantly. Mr. Marks concluded that about $1.20 per ton profit might be obtained by mining 600 tons per day over 15 years (with 160 working days per year). Income would be about $120,000 per year over 15 years. The present value of an annuity which would yield $120,000 per year for 15 years, discounted at a rate of 30 percent to reflect the high risk, would cost about $390,000. If the risk were reduced by additional exploration to that of an average, thoroughly explored mineral property, a 15 percent discount rate could be used and the cost of an annuity would be about $700,000. Mr. Marks observed that additional exploration, however, might prove that the deposit is less valuable.

18. (a) On July 31, 1973, John C. Stentz, mineral examiner for the Forest Service, completed a preliminary report on the mineral examination the Red Ives District Ranger had requested on September 23, 1968. Field examination began on October 1, 1968, and was terminated because of adverse weather on November 8, 1968. Additional field work was done September 14–22, 1972. The purpose of the examination was to determine if qualified discoveries had been made within each placer claim or association of placer claims. The specific claims involved were the Ruby 1946, 1953, and 1961 locations, and the Joe 1961 and 1962 locations. Although notified of the October 1968 field work, the claimants did not appear or have a representative present. No field work was done during the 1970 field season, and the work was limited to a record search pending identification of the claim corners. In 1971, James Click, Vernon Hoven, and John Stentz met and agreed that Mr. Click would identify the claim corners. As of July 31, 1973, this had not been done. The preliminary report stated that a final report cannot be completed until the claim corners are found and platted, some additional sampling is done, volumes of gravel in bars within the claims are estimated, and the various pertinent records are reviewed. The precise location of the claims on the ground was not known.

(b) In 1968 and 1969, the Forest Service had made cuts in the St. Joe gravels from Scat Creek bar upstream to Ruby Creek. A backhoe was used to make the cuts from 2 to 6 feet in depth; some of the cuts exposed bed rock. Mr. Stentz took samples from these cuts, from past workings of the

claimants, and from the garnet stock pile at the dredge site on Scat Creek bar. The following table shows workings inspected by Mr. Stentz:

| Working | Location—Dimension | Sample No. |
|---|---|---|
| Cut No. 1 | At mouth of Timber Creek—6½ feet deep by 36 feet long and 8 feet wide. | 5054 |
| Cut No. 2 | 10 feet wide by 20 feet long by 5 feet deep, situated alongside access road, 100 feet east of St. Joe River and southwest corner of meadow at river ford. | 5055 |
| Cut No. 3 | 20 feet wide by 30 feet long by 4½ feet deep. Situated on west side of river. | 5056 |
| Cut No. 4 | 40 feet wide by 50 feet long by 2 to 4 feet deep. Shallow pit in old river bar above Ruby Creek. | 5057 |
| Cut No. 5 | Bar in river bend at Rose Lodge. Dozer cut 30 feet long by 14 feet wide by 3 to 4 feet deep. | 5058 |
| Cut No. 6 | Opposite Timber Creek. Dozer cut 10 feet wide by 15 feet long by 5 feet deep. | 5059 |
| Cut No. 7 | 30 feet long by 20 feet wide by 3 feet deep. 100 feet from Cut No. 6 in bank of river. | |
| Cut No. 8 | Dredge site. 400 feet from mouth of Scat Creek. Cut 6 feet by 14 feet by 5 feet deep, flooded. | No sample |
| Cut No. 9 | Dredge site. Scat Creek near pit No. 8. 50 feet east of river bank. 9 feet by 24 feet by 4 feet deep. | 5060 |
| Stock Pile | Dredge site. Scat Creek. Garnet stockpile. | 5061 |

(c) The gravels sampled were dug from the floor of the pits or below the floor of the cuts left open by claimants. The gravel was panned, the concentrate was retained and assigned a sample number, and delivered to the Montana Laboratory Company for analysis. The concentrate was weighed and the garnet was removed by magnetic separation. This was weighed and the percent garnet calculated. Amalgamation assays were made on the concentrate tailings after the garnet was removed. A small amount of the gold did show up in the garnet concentrate. The following table shows the percent of garnet in the gravel, pounds of garnet per cubic yard of gravel, and value of the gold recovered from the gravel after removal of the garnet:

| Sample No. | Percent Garnet in gravel percent | lbs/cu. yd. | Milligrams Au in tails | Calculate Value Au/cu. yd. gravel ($) |
|---|---|---|---|---|
| 5054 | 0.64 | 17.95 | .03 | $0.0012 |
| 5055 | 1.06 | 23.74 | none | none |
| 5056 | 1.97 | 55.05 | .07 | 0.0033 |
| 5057 | 0.36 | 9.94 | none | none |
| 5058 | 0.50 | 14.10 | .03 | 0.0060 |
| 5059 | 0.71 | 19.80 | .04 | 0.0020 |
| 5060 | 0.38 | 24.65 | .07 | 0.0050 |
| 5061 | – | – | .08 | – |

Price of gold: $114.188 per troy ounce, June 4, 1973.

(d) Mr. Stentz concluded from the assay and testing data the value of the gold in the pit gravel ranged up to 80 cents per cubic yard and had no commercial possibility. The average garnet content was 0.87 percent, with certain layers of the gravel beds containing much higher percentages. The average garnet content would be too low to sustain an economic operation, but some layers may have commercial possibilities. He summarized his conclusions: (1) not all of the gravel is valuable garnet bearing ground; (2) the gold content of the gravel above bed rock is too small to be of any significance; (c) valuation of the gold content on bed rock has not been done.

(e) Findings in the preliminary report included:

—Most of the claims appear to be improper locations. The claims are not properly described or monumented. This matter cannot be confirmed until the claimants identify the missing claim corners.

—Some of the development workings and discoveries are apparently outside of the claim boundaries.

—The sampling of the surficial gravels in cuts opened by the claimants in 1968–1969, does not show significant amounts or values of placer gold or garnet which would qualify discovery. Some additional sampling of these surface cuts may be necessary.

—The claimants have drilled and dredged to bed rock on the Scat Creek River bar. They have record data which alleges to show significant amounts of placer gold and garnet on or just above bed rock. The Forest Service will either have to accept this data or insist it be confirmed. There is no assurances the samples are representative of the ground. In the opinion of the examiner, none of this data should be accepted without check sampling and evaluation.

—The indicated depth to bed rock is 9 to 12 feet over most of the area bars. Seismic soundings indicate some of the gravel bars at the north end of the Ruby claims may be 15 to 30 feet in depth.

19. (a) In 1974, Leo Hurley tried to sublease the claims to Robert Walling. Mr. Walling and Forest Service personnel took samples on Scat Creek bar at depths from 5 feet to 7.5 feet. The samples were sent to the Bureau of Mines, Albany Metallurgy Research Center, for testing, which made a report on May 28, 1975: Beneficiation Tests on Stream Sediment Samples.

(b) The testing included: washing, sizing, tabling, and magnetic separation to concentrate the heavy minerals and separate the garnet. The samples were as follows:

| Sample No. | Depth designation, ft | Wet weight, kg | Weight volume, ft³ |
|---|---|---|---|
| 5 | 7 – 7.5 | 33.646 | 0.4890 |
| 5 | 6.5 – 7 | 34.005 | .4890 |
| 5 | 6 – 6.5 | 31.255 | .4746 |
| 5A | 5 – 6 | 32.502 | .4890 |
| 5B | 5 – 6 | 31.482 | .4602 |
| Skims | | | |
| TOTAL | | 140.898 | 2.4592 |

The following table shows the calculated composite of the test data:

| Product | Weight (gram) | Vol. (cu. ft.) | Weight (%) |
|---|---|---|---|
| Total Garnet | 16,395 | .2331 | 6.1 |
| Total Tails, rejects, and non-magnetic | 252,395 | | 93.9 |
| TOTAL | 268,790 | | 100 |

(c) The report concluded: (1) garnet was the only mineral of potential economic value observed in the samples; (2) the garnet was an almandite type, which is an iron-aluminum garnet, with minor Mg and Mn; (3) the total garnet content was 6.1 percent; and (4) visual observation indicated there was no free gold in any of the samples.

(d) Mr. Walling had problems in getting equipment on the claims to obtain the data he needed. On August 21, 1974, Mr. Walling notified Leo Hurley that because of the lack of precise sampling of the properties and the discontinuities of the placer values of the drill holes, a sublease agreement on the terms offered would not be acceptable. He declined the proposal offered by Leo Hurley and did not proceed with a sublease.

20. (a) On May 2, 1975, the Forest Service approved a plan submitted by Leo Hurley & Associates to dig test pits with a backhoe on Scat Creek bar. The plan provided for test pits at five more or less locations, extraction of samples, and refilling the pits with the removed materials. The approval noted that the claims appeared to be improperly described and monumented, and that previous samples did not show significant amounts or values of placer gold or garnet to qualify as a discovery. Without resolving the validity questions, the Forest Service amended and agreed to the plans for further testing.

(b) The backhoe samples were sent to Silver Valley Laboratories, Osburn, Idaho, where they were amalgamated. The Silver Valley Lab. assays showed low gold values; no assay showed as much as a milligram of free gold. The results were reported to Leo Hurley & Associates.

(c) On August 28, 1975, CKC Drilling Co., started to drill on Scat Creek bar for Leo Hurley. Eight holes were churn drilled over a number of days. Forest Service personnel were present to observe the drilling. The samples were separated into concentrate (approximately 20% of the whole sample) and tails (remaining 80 percent). Some of the samples from the drill program were split with the Forest Service. Samples from three of the eight drill holes were split (holes 12, 13, 14); the Forest Service received nine of the 50 samples of concentrate that contained gold values. The Bureau of Mines examined the samples for the Forest Service. The Bureau of Mines found only slight traces of black sands, heavy minerals associated with gold in a few samples, and none in others. Micromercury balls were found in one sample. A few fine and very fine pieces of gold were observed. The test results were provided in defendant's exhibit No. 17.

(d) Leo Hurley took the bulk of the drilling samples to Parker Laboratories, Denver, Colorado, to determine the occurrence of gold, its characteristics, and recoverability from the gravels. He left instructions on how the first set of samples were to be tested. The results were reported by the owner to Mr. Hurley. Mr. Hurley went back to Parker Laboratories to have further testing done. He observed all of the additional testing done by Parker Laboratories. The concentrates from the field were concentrated by Parker Lab. on a shaking table; the subconcentrate from the shaking table was sized by screening through 10 mesh, 20 mesh and 65 mesh screens. Some of the samples were amalgamated and then fire assayed. Not all of the samples were subjected to the same procedures.

(e) The results of the Parker Laboratories work are questionable and the data is inconclusive because of the fire assay. Plaintiffs contend that the testing shows that 18 percent was locked in gold, and 83

percent was free gold recoverable by amalgamation. Plaintiffs' computations[4] were based upon selected samples, and no showing was made that the samples selected were representative. Four or five of the first samples run may have been inadvertently "salted" in the laboratory because the equipment previously had been used for "some very high grade work."

21. (a) A mineral examination of Scat Creek bar was made by the Forest Service on September 27, 1977; five bulk channel samples were taken from Scat Creek bar: one from an existing pit, one from an existing trench, and three from pits hand dug at the time of sampling. Samples averaged 180 lbs., and sample depth averaged 4 feet. Bed rock was not reached at any sample location. The mineral examination was done by Davis Hintzman and Roger Minnich, Forest Service mining engineers. The samples were analyzed by Forest Service employees Davis Hintzman, Terry Ellsworth, and Deborah Markley. The report of mineral examination was submitted November 9, 1978.

(b) The samples were concentrated by means of a Denver Gold Saver, sluice box and panning. Free gold was separated by amalgamation and garnet by magnetic separation. The nonmagnetic portion of each sample was ground and then amalgamated to determine locked in gold content. Volumes were calculated at 3,000 lbs./cu.yd. Gold fineness of 900 was assumed, and gold was valued as of October 2, 1968, at $39 per ounce or 0.125 cents/mg. The following Table shows recovered gold (mg):

| Sample | Vol./cu. yd. | Amalg. Total | mg/cu. yd. | Cents/cu. yd. |
|--------|------|------|------|------|
| SC–1 | .062 | .1 mg. | 1.5 | .2 |
| SC–2 | .079 | 1.5 mg. | 17.1 | 2.1 |
| SC–3 | .075 | .2 | 2.4 | .3 |
| SC–4 | .033 | .1 | 2.7 | .3 |
| SC–5 | .048 | .2 | 3.8 | .5 |

(c) The garnet analysis was as follows:

| Sample | Net Wt. lbs. | Pan & Riffle Concentrate | Pan Tails | Riffle Tails | Total |
|--------|------|------|------|------|------|
| SC–1 | 198 | .8% | .2% | .1% | 1.1% |
| SC–2 | 238 | 1.7 | .1 | – | 1.8 |
| SC–3 | 226 | 1.1 | .5 | .3 | 1.9 |
| SC–4 | 99 | .5 | .04 | .02 | .6 |
| SC–5 | 143 | 1.4 | .6 | .6 | 2.6 |

(d) Mr. Hintzman concluded: (1) there was no discovery of a valuable mineral; (2) the claims were improperly located; and (3) the gravel deposits were non-mineral in character.

22. In the report of the Secretary of Agriculture for the Wild and Scenic Rivers Act, "Study Report and Final Environmental Statement on the St. Joe River", the Forest Service utilized portions of the 1971–72 Bureau of Mines survey made by Mr. Marks. The section captioned "Mineral Resources" states that a brief summary of the findings of the 1971–72 Bureau of Mines is reported. The findings included:

—The largest placer resources are between Red Ives and Wisdom Creeks, where there is an estimated total of 10 million cubic yards of gravel.

—It is estimated that between Color and Heller Creeks on the St. Joe, there

may be more than 70,000 tons of garnet. The principal market for garnet is the metal cleaning industry, present markets are limited, and the 19,000 tons United States garnet production in 1972 equaled 1972 consumption.

—More than 3,800 mining claims have been located in the St. Joe drainage. Some mineable deposits have been discovered. The placer deposits on the St. Joe River between Scat and Ruby Creeks and on Mosquito Creek appear to have potential for development.

—Garnet deposits on the main St. Joe alone might produce about $3.0 million gross revenues if mined—an equivalent of about 3 jobs for 8 years.

—The cost estimate, based on 1975 prices, for mineral rights acquisition for the entire St. Joe drainage was $1 million.

23. (a) In August 1978 and August 1979, a Forest Service mining engineer conducted a surface sampling program of Ruby claim Nos. 3 through 6 and Joe claims Nos. 1 through 6 and Nos. 8 through 10 as described in the 1976 amendments. In October 1980, the Corps of Engineers drilled on Ruby Nos. 1 and 3 for the Forest Service. The final report of these mineral examinations, dated July 20, 1982, states that all claims are null and void for lack of discovery of a valuable mineral as required under the mining law.

(b) Although the claimants were notified of the validity investigation, they did not participate in the sampling program. Samples were taken from all gravel bars, except from the gravel bars on Joe Nos. 3 and 5, which were considered to be of insignificant yardage. Samples were taken from hand dug pits by channeling the sides from the bottom of the pit to the bottom of the overburden. Sample weight averaged 153 pounds. Depth, determined by the water table, averaged 4½ to 5 feet. No sample pits reached bed rock. Samples were run through a Denver Gold Saver, with riffle concentrate amalgamated by prescribed standards. Sluice tailings were saved and the garnet content was separated magnetically. To determine presence of locked in gold in quartz, black sand or other tailing fractions, selected samples were fire assayed. All assays indicate the amount of locked in gold is infinitesimal and not recoverable under field conditions. Samples and drill hole data were identified with reference to the particular Ruby or Joe claim involved. An economic analysis was made with respect to each Ruby and Joe claim (1976 amendments). Price per ton of raw garnet was $33.75 for 1968; the 1968 gold price was $39/ounce.

(c) Mr. Minnich's conclusions from the sampling and drilling data included:

—Garnet sand is the major mineral with economic potential, with a minor recovery of gold as a by-product.

—The combined average garnet content for Ruby No. 3 and No. 4 is 5.42 percent. The Ruby No. 5 garnet content averages 2.18 percent and the Ruby No. 6 averaged 0.7 percent garnet content.

—No commercial value for gold or garnet was indicated from the sampling in all of the Joe claims.

(d) An economic analysis was made for a hypothetical mine on Ruby Nos. 3 and 4, including Scat Creek bar. The analysis was based on the percentage of garnet and the amount of gravels sufficient for an 11–year operation. Total gravels available to mine were 1,595,607 cubic yards. Over an 11–year period, 146,080 cubic yards would be mined per year. The weighted average for Ruby Nos. 3 and 4 for garnet content was 5.42 percent. Gold recovery at 1968 prices equaled $9,097 per year. Total income per year was $349,317, with $340,-220 derived from garnet, and $9,097 from gold. Total yearly expenses were $483,-278. This resulted in a total loss of $133,-961 per year.

## DISPOSITION

Federal mining law permits citizens to explore, discover and extract valuable minerals from the public domain, and to obtain title to lands that contain such discoveries. The purpose of the 1872 mining law is to encourage citizens to take the risk to explore, find and develop otherwise unknown mineral deposits. All valuable min-

eral deposits in lands belonging to the United States are open to exploration and purchase under regulations prescribed by law and according to local customs of miners that are not inconsistent with the laws of the United States. As to claims filed after May 10, 1872, the mining law provides that no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. 30 U.S.C. §§ 22, 23 (1982). The statute provides for the obtaining of a patent "for any land claimed and located for valuable deposits." 30 U.S.C. § 29 (1982). Whether the statutory requirements for a location and discovery of valuable deposits have been met is a question of fact.

■■■ Rights on unpatented mining claims are limited to possession, and title remains in the United States. The basic right of a holder of a valid unpatented mining claim is an exclusive right of possession for mining purposes only. *Cameron v. United States*, 252 U.S. 450, 460, 40 S.Ct. 410, 412, 64 L.Ed. 659 (1920). Until a patent issues, the United States as a fee owner, retains paramount rights and interests in the Federal lands under the claim, and maintains the authority to regulate the uses of those lands. *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336, 83 S.Ct. 379, 382, 9 L.Ed.2d 350 (1963). The United States may regulate mining activities in the national forests in order to protect surface resources. *United States v. Grimaud*, 220 U.S. 506, 522, 31 S.Ct. 480, 485, 55 L.Ed. 563 (1911). Until the discovery of a valuable mineral deposit, the locator has only a gratuity from the United States. *Union Oil Co. v. Smith*, 249 U.S. 337, 346, 39 S.Ct. 308, 310, 63 L.Ed. 635 (1919); *Ickes v. Underwood*, 141 F.2d 546, 548 (D.C.Cir.), *cert. denied*, 323 U.S. 713, 65 S.Ct. 39, 89 L.Ed. 574 (1944).

■■■ In determining the validity of contested mineral claims, the following principles apply:

—A mining claim does not create any rights against the United States and is not valid unless and until all requirements of the mining laws have been satisfied. One of these requirements is the actual physical finding of a valuable mineral deposit within the limits of the claim. *United States v. Coleman*, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968); *Foster v. Seaton*, 271 F.2d 836 (D.C.Cir.1959).

■■■ —A valuable mineral deposit is an occurrence of mineralization of such quantity and quality as to warrant a person of ordinary prudence in the expenditure of time and money in the development of a mine and the extraction of the mineral. The mineral deposit that has been found must have a present value for mining purposes. The prudent man test is refined and complemented by the marketability test, which requires a showing that the mineral can be extracted, removed, and marketed at a profit. The marketability test throws light on a claimant's intention to secure the land for the purpose of mining a valuable deposit, and it identifies more objectively the factors relevant to a determination that a deposit is valuable. *Chrisman v. Miller*, 197 U.S. 313, 322–23, 25 S.Ct. 468, 470–71, 49 L.Ed. 770 (1905); *United States v. Coleman*, 390 U.S. at 602, 88 S.Ct. at 1330; *Converse v. Udall*, 399 F.2d 616, 621 (9th Cir.1968), *cert. denied*, 393 U.S. 1025, 89 S.Ct. 635, 21 L.Ed.2d 569 (1969).

■■■ —Mineralization that only warrants further prospecting or exploration in an effort to ascertain whether sufficient mineralization might be found to justify mining or development does not constitute a valuable mineral deposit. A valuable mineral deposit has not been found simply because the facts might warrant a search for such a deposit. *Chrisman v. Miller*, 197 U.S. at 322–23, 25 S.Ct. at 470–71; *Barton v. Morton*, 498 F.2d 288, 290 (9th Cir.1974).

■■■ —When land is closed to location under the mining laws subsequent to the location of a mining claim, the validity of the claim cannot be recognized unless the claim was supported by a valid discovery at the time of the withdrawal. A mining claimant has no rights to endeavor to make a discovery after a withdrawal and thus prevent the United States from devoting the land to other uses. *Cameron v. United States*, 252 U.S. at 456, 40 S.Ct. at 411;

*United States v. Gunsight Mining Co.*, 5 IBLA 62, 64 (1972).

■ —When the Government contests the validity of a mining claim in an administrative proceeding, it bears only the burden of going forward with sufficient evidence to establish a prima facie case. The ultimate burden is on the mining claimant, who is seeking the benefits of the mining laws, to establish that the charges made by the Government are not true and the mining claim is valid. *Foster v. Seaton*, 271 F.2d at 837–38; *United States v. Springer*, 491 F.2d 239, 242 (9th Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974); *United States v. Taylor*, 19 IBLA 9, 82 I.D. 68 (1975).

■ —If a valuable mineral deposit exists, it is incumbent upon the claimant to discover it. The function of the Government mineral examiner is simply to verify, if feasible, whether the claimant has, in fact, found a valuable mineral deposit. *United States v. Ramsey*, 14 IBLA 152 (1974); *United States v. Woolsey*, 13 IBLA 120 (1973).

■ —If a claim is not valid at the time of withdrawal it is not excepted from the effect of the withdrawal. *Cameron v. United States*, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920). An invalid mining claim cannot thereafter become valid by additional exploratory work or through an increase of mineral values due to a change in the market. Post-withdrawal samples are admissible to confirm a discovery prior to the date of withdrawal. Sampling and other testing of claims after withdrawal is admissible as evidence to confirm and corroborate preexisting exposures of a valuable mineral deposit. The date of the exposure of the source of the sample and not the date of the taking of the sample is determinative of whether or not a sample is proper evidence. *Converse v. Udall*, 399 F.2d at 622.

■ —Once there has been a valid discovery and a proper location, an unpatented mining claim is real property in the highest sense. Upon location of a valid claim, the area becomes segregated from

the public domain. *St. Louis Mining & Milling Co. v. Montana Mining Co.*, 171 U.S. 650, 655, 19 S.Ct. 61, 63, 43 L.Ed. 320 (1898); *Best v. Humboldt Placer Mining Co.*, 371 U.S. at 336, 83 S.Ct. at 382; *Freese v. United States*, 226 Ct.Cl. 252, 639 F.2d 754, 757 (1981).

In their posttrial briefs, plaintiffs argue that all of the claims were properly located in compliance with the mining laws and that on all claims gold and garnet minerals were found and grade determined before the October 1, 1968, withdrawal. Plaintiffs rely upon geologic investigations allegedly made prior to 1968 by the original locators and by CRM. As to the requirement to show a valuable deposit, plaintiffs argue that proper classifications of the reserves are adequate to establish the extent of the deposits on all claims, that the evidence shows a progression from exploration to development work, that five separate organizations invested money and time in recognition of profit potentials from mining the claims, and that calculations by experts, from both the Bureau of Mines and the parties, established that a hypothetical, "paper", mine would be profitable. Finally, plaintiffs argue that their property interests were taken administratively by the Forest Service through its denial from 1976 through 1978 of the right of access, as provided by the mining law, to develop and mine their claims, and, legislatively by enactment of Section 708, and the designation of the St. Joe River as a part of the wild and scenic rivers system.

Defendant denies there was a discovery before October 2, 1968, and asserts that plaintiffs' monumentation of the claims was inadequate to establish a valid location under the mining laws. Defendant further contends there was no interference with any of plaintiffs' property rights that could amount to either an administrative or legislative taking.

The status of plaintiffs' claims as of October 2, 1968, the effective date of the withdrawal under the Wild & Scenic Rivers Act is determinative of their validity under the mining law. Plaintiffs must have located the claims properly on land open to

entry, and must have made a discovery of a valuable mineral deposit within the boundaries of each claim, or properly located portion thereof. Parts of Ruby Nos. 2, 3 and 5 and Joe Nos. 2, 3 and 4, as described by plaintiffs in their location notices had been withdrawn in 1950 and 1955. These areas were not available to claim, and plaintiffs assert no property rights as to those withdrawn areas. After October 2, 1968, the Government's ownership of the minerals in the areas not previously withdrawn could not be divested from the Government by discovery of valuable mineral deposits.

Evidence of sampling and other testing of claims after withdrawal is admissible to show whether a valid discovery had been made by October 2, 1968. Such post-October 2, 1968, evidence of sampling and testing is admissible, however, only to confirm and corroborate preexisting exposures of minerals that were uncovered prior to withdrawal.

■ The record does not support plaintiffs' contention that a discovery had been made October 2, 1968. The limited exposures made on plaintiffs' claims prior to October 2, 1968, were insufficient to establish that valuable amounts of gold and garnet were contained in the gravel deposits covered by the claims.

As detailed in the findings, plaintiffs' pre-withdrawal evidence is limited to (1) location pits panned by the original locators, (2) nine churn drill holes in 1962 by CRM on Ruby Nos. 1 and 3, six of which were on Scat Creek bar, (3) dredging operations on Scat Creek bar in 1963, and (4) the field work in 1967 by Paul Hopkins for Shield Minerals Corporation (SMC) that included panning samples on gravel bars on Ruby Nos. 3, 4, 5, and possibly 6, and four backhoe samples, two on Joe No. 10, and one each on Joe Nos. 3 and 1. In addition, at a date uncertain in late 1968, reported on January 6, 1969, LTV Aerospace had a field examination made by H.B. Renfro of the garnet deposits on Ruby Nos. 1 through 6, Ruby Nos. 10 through 15, and Joe Nos. 1 through 6, 8 and 9. The content of Mr. Renfro's field examination is not described.

His report recommends further investigation, and states that preparation of estimates of the quantities of garnets available could be done in 1969.

Plaintiffs' contentions relative to pre-1968 exposures and activities relies heavily on a statement, and attachments referenced in the statement, made by James R. Maynard, who was CRM's general manager, and later its president. The statement is contained in an exhibit that was admitted in evidence under the hearsay exception provided in the Fed.R.Evid. 804(b)(5). Mr. Maynard was deceased by the time of trial. Defendant objected to admission of the exhibit because the statement was given in an interview that was conducted by plaintiffs' attorney on August 28, 1980, during the period this case was suspended to permit the parties to pursue administrative proceedings. Defendant was not invited to participate, and defendant had no opportunity to cross-examine Mr. Maynard, relative to the hearsay within hearsay elicited by plaintiffs' counsel. The conclusions plaintiffs draw from this exhibit are not supported by Mr. Maynard's statement and the attachments to his statement. Although four attachments are referenced in the statement, a map purporting to represent the Ruby and Joe claims is not included in the exhibit and is not in evidence. The origin of the remaining three attachments is uncertain. Another attachment, captioned "Results of Mill Testing of Concentrates from Dredge" purports to be an assay for garnet and gold prepared on October 23, 1963, by Montana Laboratory Company, Philipsburg, Montana. The results are based on testing of concentrated material, the ratio of concentration is unknown, and the information in the attachment is not probative of gold values.

Mr. Maynard estimated that Montana Laboratory had made up to 150 assays for CRM; this is the only assay, however, that was submitted in evidence. Other CRM records either are non-existent or are not available.

Plaintiffs cite Mr. Maynard's statement, and its attachments, for a contention that the mean average garnet content in the

gravels in the Ruby claims from Spruce Tree Campground to Timber Creek (Ruby Nos. 1 through 3) was 15.87 percent by weight. Mr. Maynard's statement is not this precise. Plaintiffs' counsel derived this percentage from calculations in which 500 lbs. of garnet were said to be obtained from a cubic yard of gravel that weighed 3,150 lbs.

Mr. Maynard's statement, and its attachments, are given little weight because of lack of specific information as to their relationship to CRM's activities and purposes. The specific financing difficulties CRM experienced were the result of proceedings in September 1964 that charged CRM with violations of the Securities Act. CRM was charged with untrue statements of material fact made in the selling and efforts to sell stock. The challenged statements related to prospects for commercial production from mining properties, and marketability of garnet to be produced from the properties leased in Idaho.

It is clear that as of October 2, 1968, the work that had been done on the claims was not sufficient to establish that a discovery of valuable deposits had been made. Additional, extensive exploration was needed to determine if the deposits on any of the claims were such that it was economically feasible to operate a mine. Substantial amounts of additional testing was required before a determination could be made to develop the claims for commercial operations.

On June 1, 1974, Vernon Hoven, on behalf of the claim owners, and Leo Hurley as lease holder, acknowledged that drill holes and other tests as of that date were insufficient and that additional testing which was to be final was needed to determine whether the claims should be abandoned or prosecuted on a full time basis. Exploration work is done prior to a discovery in an effort to determine whether the land contains valuable minerals. Although the presence of minerals are shown, it is often necessary to do further exploratory work in order to determine whether those minerals have value. Where only enough mineral is found to justify further

exploration work, a discovery has not been made.

As of June 1, 1974, testing on plaintiffs' claims was still exploratory work. The field examinations and tests to that date were not adequate to establish that a discovery of valuable minerals had been made before October 2, 1968. The core of plaintiffs' claim, that post-withdrawal testing disclosed a discovery of valuable minerals had been made before October 2, 1968, is the exploratory work that was done in 1975. Plaintiffs contend that the 1975 test data provided an adequate foundation to declare further exploratory work was no longer needed, that a discovery was shown, and it was in order to prepare an operating plan for development work to establish a mine on the deposits. The exploratory work that was done on the claims after June 1, 1974, produced inconclusive results. This work did not establish such a discovery of valuable minerals as that required before there can be a reasonable basis for undertaking mine development work.

In 1974, Mr. Hurley tried to sublease the claims to Robert Walling, who represented Flat Creek Mining of Alaska. Mr. Walling and Forest Service personnel took samples on Scat Creek bar (Ruby No. 3 (1976)) at depths from 5 feet to 7½ feet, and sent them for testing to the Bureau of Mines, Albany Metallurgical Research Center. The May 28, 1975, report showed that garnet was 6.1 percent by weight of the samples tested and that there was no free gold in any of the samples. Mr. Walling declined to enter a sublease for development of a mine on the property.

The test program approved on May 2, 1975, for Leo Hurley & Associates also was limited to Scat Creek bar. It involved five test pits dug by a backhoe, from which some samples were sent to Silver Valley Laboratories, Osburn, Idaho, to assay for gold. The samples were amalgamated. The Silver Valley assays showed low gold values, with no assay showing as much as a milligram of free gold. The results were reported to Leo Hurley & Associates. No tests were run to evaluate the garnets.

Leo Hurley wanted to churn drill Scat Creek bar to determine the gold characteristics in order to decide what type of equipment would be needed for its recovery. On August 28, 1975, CKC Drilling Company started operations on Scat Creek bar and ultimately churn drilled eight holes, with Forest Service personnel present as observers. The samples were separated into concentrate, approximately 20 percent of the sample, with the remaining 80 percent as tails.

Some of the drill samples were split with the Forest Service for independent testing. The Forest Service received split samples, including both concentrate and tails, from three of the eight drill holes. The Forest Service received nine of the 50 samples of concentrate. The Bureau of Mines, which examined the Forest Service splits, found only slight traces of black sands, heavy minerals associated with gold in a few samples, and none in others. In one sample, micromercury balls were observed. A few fine and very fine pieces of gold were observed. The presence of micromercury balls is not explained. Plaintiffs' suggestion that their presence indicates that the samples had been processed prior to arrival at the Bureau of Mines is pure conjecture that has no record support.

Leo Hurley took the bulk of the drill samples to Parker Laboratories, Denver, Colorado. The results of Parker Laboratories' testing are uncertain. Some of the samples were amalgamated and then fire assayed. Not all of the samples were subjected to the same procedures.

Plaintiffs contend that the Parker Laboratories tests showed 18 percent was locked-in gold and 83 percent was free gold recoverable by amalgamation. The results of the Parker Laboratories are questionable and the test data is inconclusive because of the fire assay. The Bureau of Mines does not accept fire assay for placer gold samples because a fire assay will recover more gold than a placer miner would ever recover by using the most efficient placer mining equipment. It generally is financially prohibitive to smelt the heavy minerals or black sands recovered from a placer gold mining operation. A fire assay of a placer sample could result in the validation of an uneconomic property. T.S. Maley, *Handbook of Mineral Law*, at 330 (3d ed. 1983). No credence should be placed in placer valuations that are based on the results of fire assays. J. Wells, *Placer Examination: Principles and Practice*, at 91. Fire assays are unacceptable to establish the validity of a placer mining claim. *United States v. Chapman*, 87 IBLA 216 (1985); *United States v. Ramsey*, 84 IBLA 66 (1984). Plaintiffs' computations of locked-in gold and free gold were based upon selected samples. Plaintiffs did not establish that the samples selected were representative of the gravels on Ruby No. 3 (1976).

The Parker Laboratories' test results also are questionable because the chemist that participated in the tests advised the Forest Service that some of the first samples may have been contaminated inadvertently by the equipment. The table used to concentrate the samples had been used previously for "some very high grade work."

The limited data produced in the 1975 test program conducted by Leo Hurley and by Leo Hurley & Associates was not adequate to justify a conclusion that a discovery of valuable minerals had been made, even as to Scat Creek bar (Ruby No. 3 (1976)). Further exploration clearly was needed before development work to mine the gravels would be reasonably appropriate. Moreover, the test data provides no support for plaintiffs' contention that discovery of valuable deposits had been made on the other Ruby and Joe claims.

On April 26, 1976, Leo Hurley submitted to the Red Ives District Ranger a plan of operations to mine the gravel bar tested in 1975 on Ruby No. 2 (1953) and/or Ruby No. 11 (1964). The plan of operations stated that "test data from the 1975 test program indicates that both gold and garnet values may be economically recovered." The plan described a floating unit and related equipment needed for dredge mining the gravel bar and a method of operations that maintained "a constant separation of pond water and river water so as not to

contaminate the river." The plan described development work that only would be warranted after a discovery of valuable minerals had been made. Test data available on April 26, 1976, however, was not adequate to support a reasoned determination that a valuable mineral discovery had been established.

Plaintiffs argue that the geological classification of the deposits on the Ruby and Joe claims as "reserves" establishes there was a discovery of valuable minerals. Plaintiffs distinguish "reserves", as deposits that are economic to mine, from "resources", which are not yet economic to mine. Plaintiffs' witnesses, Hopkins, Marks and Winegar, variously classified the deposits as measured, indicated or inferred reserves. Any one of these reserve classifications, according to plaintiffs, is sufficient to prove discovery.

Plaintiffs' distinction between "resources" and "reserves" is too neat. "Resources" is a general category that includes all "reserves". The limited exposure data on the deposits is not adequate to establish any reserve classification. Even the gravels on Scat Creek bar, which was the site of the most extensive testing, could only be characterized as "potential reserves".

The nature of the gravel deposits on these claims preclude precise geologic classification. The evidence is clear that the gravels are not uniform deposits, but in fact are characterized by erratic distribution of the minerals. Plaintiffs attempted to use geologic inference to increase the gold and garnet values at depth, and to extend data obtained on one claim to support allegations of discovery on other claims.

In evaluating the claims, defendant drilled to bed rock where plaintiffs indicated they had drilled in the past and took dug samples in all places that had sufficient gravels to sample. It is clear that there is insufficient garnet above Ruby Creek or on the Joe claims to mine commercially for that mineral. Gold deposits on both the Ruby and Joe claims are erratically distributed throughout the deposits, and the drill hole results show that mineralization does not increase at depth in the gravels. The report of plaintiffs' expert states that the gold deposit is not restricted to bed rock. The report contains an illustration that shows the erratic and discontinuous nature of gold distribution in the gravels.

Plaintiffs point to the efforts of CRM, IMCT, LTV Aerospace, SMC, and Leo Hurley & Associates as proof there was a discovery of valuable minerals on the claims. These efforts are said to show satisfaction of the prudent man test and marketability test. Investments of time and money by these organizations allegedly demonstrate that there was a prospect of profit sufficient to invite prudent men, and that there was a reasonable prospect of developing a profitable mine.

What men have done or have not done over a period of years is proper evidence as to the conduct of a prudent man in similar circumstances. *United States v. Alaska Limestone Corp.*, 66 IBLA 316 (1982). Actual production is not a precondition of establishing a discovery of a valuable mineral deposit. The failure to produce over time, however, can give rise to a presumption that the market value of discovered minerals was not sufficient to justify the costs of extraction. *See United States v. Zweifel*, 508 F.2d 1150, 1156 n. 5 (10th Cir.1975). Failure to develop a claim over a period of time is sufficient to establish a prima facie case of invalidity of the claims. *United States v. Hess*, 46 IBLA 1, 8 (1980). Under the varying economic conditions that occur over a period of many years, a mining claim usually will be developed unless it is not commercially feasible to do so profitably.

Plaintiffs, or their predecessors, have asserted claims on these St. Joe River deposits since 1953. Prior to the 1968 withdrawal, the Ruby claims were leased first to a Mr. Pringle, then to a Mr. Tyler, then to CRM, then to IMCT. Plaintiffs attempted to interest SMC and LTV Aerospace into leasing the claims. None of the leases produced a sale of any mineral from any of these claims. Apart from CRM, which

abandoned the attempt prior to marketing any garnet, none of the parties were sufficiently interested to even attempt to develop the claims. No effort has ever been made to develop the Joe claims, and all activities on the Ruby claims were abandoned prior to going into commercial production.

Most of the interest in plaintiffs' claims has focused on the garnet gravels on Ruby No. 3. On Ruby No. 6, and on all of the Joe claims, there is insufficient garnet to mine for that mineral. No person has considered the development of a mine on any of the claims solely for gold. The Ruby No. 6, and all of the Joe claims, have not been tested to bed rock. The activities of plaintiffs and their lessees do not disclose there was a reasonable prospect for the development of a profitable mine on any of the claims.

Plaintiffs suggest, as to each potential developer, there is a reasonable justification for nondevelopment of the claims. Plaintiffs cite Forest Service opposition to IMCT and Leo Hurley & Associates, CRM's securities problems, and LTV Aerospace cash flow problems. These arguments are not persuasive. The evidence discloses that the Forest Service, through the 1960's and up to the inclusion of the St. Joe River in the wild and scenic rivers system in 1978, was cognizant of, and acted in compliance with, its responsibilities to accommodate legitimate mining uses in the national forest. Although the Forest Service personnel were opposed to dredge mining in the national forest, they accommodated plaintiffs in the efforts for access to the claims, and cooperated with plaintiffs to the extent consistent with their responsibilities to other forest users. IMCT's monetary expenditures mainly were concerned

with its efforts on the Mosquito Creek claims, and it withdrew its request for a Forest Service special use permit when it was unable to obtain an Idaho dredge mining permit. LTV Aerospace decided not to accept Leo Hurley's recommendation to establish a natural resources subsidiary after he had made a presentation to the board of directors. There is no evidence, other than the testimony of Leo Hurley, that his analysis of garnet production costs and the market for garnets from the St. Joe River claims was acceptable as a business proposition to LTV Aerospace.

After plaintiffs' complaint was filed in this court, the Forest Service conducted additional churn drill tests on the Scat Creek and Spruce Tree bars, and each party retained experts to analyze previously collected information and prepare reports on that information. The Forest Service churn drilling project was done at the direction of Roger Minnich. His report, "Mineral Examination, 1980 Drilling on Scat Creek Bar", was completed in April 1981. The results of this program were included in Mr. Minnich's final 1982 report. Plaintiffs' expert was Robert C. Winegar, president of Geoplan Inc. Geoplan's report "Review of Existing Data and Reserve Calculations for the Ruby and Joe Claims" is dated October 31, 1984. Defendant's expert was Leslie C. Richards; his report "Mineral Appraisal of Ruby and Joe Groups of Associated Placer Mining Claims" is dated April 30, 1985.

The Forest Service 1980 churn drill program consisted of a total of five holes on Scat Creek bar and two at Spruce Tree Campground. The samples from the holes were processed in the same way as the 1978 and 1979 surface samples. The garnet grade for the drill hole areas was:

|  | Total Sample Weight (lbs.) | Garnet Weight (lbs.) | % Garnet |
|---|---|---|---|
| Scat Creek | 1384 | 139.6 | 10.1 |
| Spruce Tree | 406.9 | 35.39 | 8.7 |

For the drill holes, the gold value by weight of the samples run through a Denver Gold Saver and the riffle concentrate after amalgamation, using a gravel weight of 3000 lbs./cu. yd. was:

| | Value/cu. yd. ($39 Au – 1968) | ($206.25 Au – 1978) |
|---|---|---|
| Scat Creek | 17.8¢ | 94.30¢ |
| Spruce Tree | 83.4¢ | 442.17¢ |

Cyanide leach tests and fire assays were performed by Idaho Bureau of Mines personnel to determine if any gold was locked-in in tails or garnets. The fire assay showed only a trace of gold and the cyanide leach showed 0.01 ounce/ton gold. The results indicated there was insufficient gold in the samples to warrant recovery.

Plaintiffs' experts, Robert Winegar and Geoplan Inc., were retained to compile, collate, and interpret existing data on the claims to determine grade and reserves. The data examined included: (1) Hopkins, 1967; (2) CKC Drilling—Hazen Research, 1969–70; (3) Marks, 1972; (4) Hurley, 1975; and (5) Minnich, 1980. Mr. Winegar reported, on the basis of these programs, that a significant gold deposit is likely. The report examined the Parker Laboratories' assays of the samples it tested and concluded that the ratio of total gold to locked-in gold was 20.4 percent locked-in gold.

With respect to Leo Hurley's 1975 drilling program on Scat Creek bar, the report noted three procedural deficiencies: (1) did not record core rise; (2) some drives were too long; and (3) use of a total sample fire assay instead of a free gold analysis. As to No. 1, the report observes that a generality of the program was that not enough material was recovered. As to No. 2, it was the primary reason not enough material was recovered, and corrective adjustments were in order. No. 3 was acceptable to Geoplan Inc. because the ratio of locked-in gold was known.

To calculate the grade of gold from the Hurley 1975 drilling program, Mr. Winegar examined alternatives available to match recovered gold from actual drill test records. He concluded that determination of grade by sample weight was too high because the churn drill procedure produced a sample that was enriched. The report explained that, as the casing shoe is driven through the gravels, some large cobbles are pushed aside allowing the gold bearing smaller fractions to enter the core. Grade by theoretical volume was found to be too low because the drive shoe plugged up, and material was not allowed to enter.

Both of these conditions were found to be present in most of the drives in the Hurley program. Initial driving of casing and shoe resulted in excess fines being sampled. As the drive continued, the drive shoe became plugged and gravels and fines could not enter the core. To correct for these conditions, Mr. Winegar applied a calculation to correct for the differences between theoretical and measured volumes. This calculation was the ratio—Theoretical Volume: Measured Volume—with an upper limit of two times the initial uncorrected figure.

This correction was applied to data from the Hurley program to establish the grade in the ground. The economics of the deposit were to be based on these results. As to Scat Creek bar, the report concluded that the proven grade of gold was 0.053 ounce per cubic yard. Using November 1978 average gold price of $203.60 per ounce, the gold value was $20.82 per cubic yard. Extrapolated to the remaining claims, the report states the calculation resulted in a total reserve of 7,281,069 cubic yards and $78,776,199.99.

Defendant at trial and in posttrial briefing established that Mr. Winegar's correction to adjust for a supposed loss of material in the sample was erroneous. The correction was based on the volume expected

from the use of a 7½ inch drill shoe normally used in placer deposits. The holes in the 1975 Hurley drilling program, however, were drilled with a 6 inch drill shoe customarily used to drill for water. The theoretical volume of a 6 inch diameter hole will always be less than that of a 7½ inch diameter hole of the same depth. At trial, Mr. Winegar was asked to recalculate the gold values of one sample using both the 7½ inch diameter shoe and the 6 inch diameter shoe. This calculation showed that the amounts of core expected for that sample in fact had been obtained, and that the resulting gold values should not have been altered. Plaintiffs have relied upon Mr. Winegar's erroneous calculations of upgraded values to support their claim of discovery.

Defendant's expert, Leslie C. Richards, was retained to make an appraisal of the mineral estate in Ruby Nos. 3 through 6, and Joe Nos. 1 through 6 and 8 through 10. The appraisal was based on an analysis that included: (1) Forest Service and Bureau of Mines' reports and sample results; and (2) reports and sample results by Leo Hurley, Paul Hopkins, and Geoplan Inc. Mr. Richards concluded that, from a mineral standpoint, the only known possible use of the land claimed is placer mining for gold and garnet. He concluded that, as of November 10, 1978, the estimated market value of the mineral estate was nil.

At trial, it was disclosed that Mr. Richards did not use Mr. Marks' results, or the results of the samples taken by the Forest Service and processed by the Bureau of Mines. He calculated the grade at which he would determine hypothetical mining costs by averaging all surface samples taken by Messrs. Stentz, Hintzman and Minnich, including surface samples on Scat Creek bar, together with drill holes on Scat Creek bar, giving equal weight to each. Each drill hole was treated as a single sample. Mr. Richards' reasons for giving equal weight to the samples from the surface and from the drill holes was that the heavy minerals in this deposit did not increase as they went to depth, and because the information from the explorations was extremely limited.

Mr. Richards calculated his mining costs per ton of garnet mined in 1978 at $100.78 at a garnet grade of 4.39 percent, with 5000 tons per year sold. This cost included costs of processing gold as well as garnet. Mr. Richards' costs per cubic yard of material mined would be $5.75 per yard.

Mr. Richards testified he would value the claims as of 1978 as being "worthless" even if plaintiffs had a property right under the mining laws. He also believed the claims to be worthless if the garnet grade was 10 percent. Mr. Richards' opinion was based in part on his conclusion that existing producers would meet any demand for garnet since they had excess capacity. His examination included contacts with existing producers. He determined that one of the two Idaho producers shut down in winter.

Plaintiffs also contend a discovery had been shown by reference to calculations for hypothetical or "paper" mines. In these calculations, revenues and costs are calculated with reference to the quality and quantity of the mineral deposit as shown by exploratory work. The mining profits of the hypothetical mine consist of the potential revenue less the estimated costs of mining the deposit, including capital in equipment, reclamation costs, marketing and similar costs applicable to the mining enterprise. Plaintiffs cite the calculations made by Mr. Marks on June 5, 1974, to reach a suggested price of $390,000 for a purchase by a government agency of the Ruby and Joe deposits, as proof that the Bureau of Mines had determined that a profitable mine could be developed. Plaintiffs cite calculations by Mr. Minnich which indicated that at 3 percent garnet the Scat Creek bar deposit could be mined at profit, to prove that the Forest Service admitted a discovery in 1978. Plaintiffs also cite the estimated profits from the plan of Mr. Hurley to mine gold alone on the Joe claims as proving that a discovery had been made on the Joe claims.

Mr. Marks' June 5, 1974, computation admittedly was a hasty and somewhat superficial analysis. It was prepared on the basis of estimates that were not accurate,

and did not include a comprehensive review of all of the costs that would apply to mining the deposits involved.

The evidence of Mr. Minnich's calculations consists of a hand written memorandum sent to the head of the Region 1 Minerals Division on March 28, 1979. It was a draft preliminary report based on estimated values. It assumed a garnet price of $100 per ton. With a garnet weight estimated at 3 percent, the calculation produced a yearly gross income of $282,700, operating costs of $92,170, and a net profit after tax of $69,930. This preliminary calculation subsequently was revised on the basis of more accurate and comprehensive cost data. Mr. Minnich's final report, dated July 20, 1982, contains a more accurate analysis. Those calculations show a $133,961 loss per year for the hypothetical mine.

Computations for a hypothetical mine necessarily must consider a variety of elements if income and costs are to be accurately reflected. The parties challenge each others calculations as inadequate in numerous respects. Plaintiffs argue that, when properly adjusted, the computations made by Mr. Richards, defendant's expert, would compare favorably to the hypothetical mine calculations made by Mr. Hurley. The arguments of the parties have been examined. The techniques used by Mr. Minnich and Mr. Richards in the determinations that the deposits could not be profita-

bly mined on the date of withdrawal in 1968, and when the St. Joe River was made a part of the wild and scenic rivers system in 1978, satisfy the prudent man test. These calculations show that no discovery of a valuable mineral had been made.

The most significant item in the calculations for a hypothetical mine on the Ruby deposits is the question of the marketability of the garnet produced. The garnet market in the United States is limited. To determine whether there is a possibility of marketing garnet mineral from these claims, the foreseeability of changes in market conditions is significant. *In re Pacific Coast Molybdenum Corp.*, 75 IBLA 16 (1983). Plaintiffs projected increased demands for garnet from a new use as a filtration medium that was developed 2 years after the area was withdrawn from mineral location. This was not a foreseeable change.

The ability to market additional sources of garnet is questionable. Plaintiffs introduced an exhibit captioned "Estimated Sales for a New Garnet Producer", dated January 1985, that contained a projection of demand for garnet from 1968 through 2000. These projections far exceeded the actual market that developed from 1975 to the date of trial. The total projected demand from plaintiffs' exhibit, and the actual garnet sold or used by United States producers for the years 1975 to 1983 was:

| | Total Projected Demand | Actual Sales or Use |
|---|---|---|
| 1975 | 27,721 | 17,204 |
| 1976 | 29,076 | 24,565 |
| 1977 | 30,331 | 20,022 |
| 1978 | 31,486 | 22,058 |
| 1979 | 32,741 | 23,303 |
| 1980 | 33,896 | 26,550 |
| 1981 | 36,461 | 25,519 |
| 1982 | 37,876 | 26,660 |
| 1983 | 39,821 | 28,902 |

In addition to the calculations for paper mines made by Messrs. Marks and Minnich, plaintiffs contend that other statements by Forest Service and BLM personnel are ad-

missions that confirm that a discovery of valuable minerals had been made. In this connection, plaintiffs refer to the Forest Supervisor's request on September 4, 1962, for an examination of the legal effect of the location notices, Forest Service responses in September and October 1962 to environmental and other user organizations regarding CRM's rights under the mining laws, and findings in the final report of the Secretary of Agriculture on inclusion of the St. Joe River into the wild and scenic rivers system. In addition, plaintiffs cite the July 31, 1973, report of Mr. Stentz as an admission that defendant had such knowledge of the location of the claims that any defect in the descriptions on file in the location notices was cured. Plaintiffs contend these admissions alone provide proof for determining discovery of valuable minerals on the claims.

The statements cited do not justify the conclusions plaintiffs draw. The statements of the Forest Service personnel are admissible as substantive evidence. Fed.R. Evid. 801(d)(2)(A). *Zenith Radio Corp. v. Matsushita*, 505 F.Supp. 1190 (E.D.Pa. 1980). The statements, however, are not conclusive as to the fact of discovery. Questions of discovery may be tested by the United States so long as title to the minerals remain in the United States. *United States v. Cannon*, 70 IBLA, 328, 337 (1983). Forest Service personnel throughout the 1960's and 1970's were cognizant of their responsibilities to all users of the national forest. The Forest Service statements that CRM had a valid discovery, and the statements that whether or not CRM had a valid discovery was not questioned, were made in this factual context. The Forest Service personnel statements were explanatory and subordinate to the principle subjects they had under consideration. The Forest Service personnel frequently challenged plaintiffs' claims on the basis of inadequate descriptions in the location notices. At no time did the Forest Service or the BLM personnel take the position that plaintiffs had located a valuable mineral. Both the Forest Service and the Interior Department representatives consistently adhered to the position that the legal validity of plaintiffs' claims could only be determined through appropriate administrative proceedings.

The findings of the Secretary of Agriculture relative to mineral resources on the St. Joe River applied to the entire main stem and were concerned with more than 3,800 mining claims in the drainage. The cost estimate to acquire the mineral rights in the entire St. Joe River drainage was estimated at $1 million. The references to garnet deposits between Color and Heller Creeks are estimates of potential values. They are not equivalent to a determination of the validity of a discovery on plaintiffs' claims.

■■■ The question of whether plaintiffs' notices of location for these claims accorded with the requirements of Federal and Idaho law has been a continuing issue. Compliance with the location requirements confers no right in the absence of a valid discovery, but it is essential to establish the validity of a claim. *Cole v. Ralph*, 252 U.S. 286, 296, 40 S.Ct. 321, 326, 64 L.Ed. 567 (1920); *Union Oil Co. v. Smith*, 249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635.

Defendant contends that plaintiffs have failed to satisfy the requirements for locations because the monumentation of plaintiffs' claims did not accord with Idaho law, and the areas actually claimed could not be identified and located. Defendant also asserts that Ruby Nos. 1 through 6, filed in 1953, were abandoned with the 1961 filings for Ruby Nos. 10 through 15. As a result, according to defendant, the 1976 Ruby filings, which purported to amend the 1953 Ruby Nos. 1 through 6 filings, were ineffective and amounted to an abandonment. The 1976 filings, defendant says, having failed as an amendment, therefore must be treated as a relocation. Defendant's argument fails to give effect to the volume of information the Forest Service and BLM in fact had about the lands plaintiffs intended to claim.

In Idaho, the locator of a mining claim originally located prior to 1976 must post a notice of location in writing on one corner of the claim and place a monument or post

at each corner, dig a prospecting pit of not less than 100 cubic feet, and record a certificate of location with local county officials. Idaho Code § 47–602. The certificates of location for each set of the claims describe the claim's location by: (a) natural monuments or objects, such as "follows the contour of the St. Joe River"; (b) artificial monuments, that is, the corners described as "exterior boundaries are distinctly marked by posts or monuments"; (c) refer to placer ground as being located; (d) the dimensions of the claims are recited as either township, section and range, or by metes and bounds description; and (e) by size of claim.

The descriptions on the faces of the notices, as well as the markings in the field, reflect an intent to claim the placer gravels in the lands that straddle the river in the St. Joe River canyon. The descriptions in the notices, however, do not accurately identify the actual boundaries of the lands claimed and when plotted, do not reflect the intent to straddle the river and include the placer gravels. As of October 2, 1968, the boundaries of the Ruby and Joe claims were not accurately located on the ground. The claims were not described in a manner that permitted the boundaries to be plotted or located on the ground with accuracy until the 1976 filings.

Prior to withdrawal of the area in 1968, the Forest Service was well informed about the gravels plaintiffs claimed. The 1968 Multiple Use Survey Report identified the Ruby and Joe claims of concern, listed the locators, noted the area claimed included the St. Joe River between Scat Creek and Heller Creek, described the acreage to be mined, and noted that initially 10 miles up to 30 would be dredged.

■ The intent of the locators, when apparent from the notices and the markings on the ground, controls the description of the claims. *Sturtevant v. Vogel*, 167 F. 448, 452 (1909). If a description gives reasonable notice, it is legally sufficient as a description. *Law v. Fowler*, 45 Idaho 1, 261 P. 667, 669 (1927). The 1968 Multiple Use Survey Report shows that reasonable notice was given by plaintiffs. That the

notice was reasonable was confirmed by the Bureau of Land Management's review that concluded the locators intended to and did claim the deposits astraddle the St. Joe River.

The 1961 filings for Ruby Nos. 10 through 15 were new locations of the placer deposits that were identified in the 1953 notices for Ruby Nos. 1 through 6. These filings were recognition that the 1953 locations were abandoned or forfeited. The affidavit, signed by Mr. Maynard, is not part of the location certificate, and it is required only when filing an original location. Idaho Code § 47–611. The affidavit is not required when a location is amended. Idaho Code § 47–605. The Ruby Nos. 10 through 15, as filed in 1961 and amended in 1964, involved more than amendments to change the tract descriptions; any limitations as to gold were removed and garnet coverage was clarified.

■ Defendant argues that abandonment of the 1953 claims renders the 1976 amendments ineffective as to plaintiffs' claims. Such a result only would follow if the rights of others had intervened. The 1976 amendments describe lands that are in large part the same as in Ruby Nos. 10 through 15, as amended in 1964. The differences in descriptions are not material as to the intent of the claimants. The 1976 amendment is adequate to change the name from Ruby Nos. 10 through 15 to Ruby Nos. 1 through 6, and to make the description of the boundaries more accurate. The claims so amended predate the 1968 withdrawal, and the 1976 amendments relate back to the 1961 filings. Accordingly, the location issue is resolved in plaintiffs' favor as there was compliance with federal and state location requirements. Plaintiffs had located a mineral deposit that warranted further exploration to ascertain whether the deposits contained valuable minerals that could satisfy the marketability test.

■ Section 708 of the National Parks and Recreation Act of 1978 provides an absolute prohibition against dredge or placer mining within the banks or beds of the mainstream of the St. Joe and its tributary

streams in their entirety above the confluence of the main stem with the North Fork of the river. 16 U.S.C. § 1274(a)(23) (1982). Prior to trial, both parties briefed the issue of what constituted the beds and banks of the St. Joe River in which dredge mining was prohibited. On the first day of trial argument was heard and a ruling was made. The definitions of the terms "beds" and "banks" involved a matter of statutory construction. The construction of the statute is a question of law.

Defendant's position was that the term "beds or banks" included the natural river channel and the sloping margin of, or the ground bordering, a stream and serving to confine the water to the natural channel during the normal course of flow. It did not include adjacent lands. It is best marked where a distinct channel has been eroded in the valley floor or where there is a cessation of land vegetation. Plaintiffs wanted a definition that included the entire canyon bottom within the term "beds or banks".

Defendant's construction was adopted. Defendant's construction gives effect to the ordinary meaning of the terms, it was compatible with other provisions of the Act, it recognized the significance of changes made during the genesis of the legislation, and it gave effect to explanatory statements made by the bill's manager in the Senate debates. One such statement was that the language prohibiting dredge or placer mining referred solely to the method of mining and not to the actual ability to mine a placer deposit by any method other than by dredging. Another statement was that the dredge or placer mining prohibition applies only within the river corridor.

■ Acceptance of defendant's definition, however, provides little assistance to defendant's contention that the claims could be mined without destroying the characteristics of a wild and scenic river. The placer gravels are located in a narrow river valley on a flood plain from 50 feet to 800 feet wide. The claims, according to the 1976 amendments, straddle the river sequentially so as to include these gravels. Each of the claims, accordingly, falls within the definition of beds or banks as referred to in Section 708. The only practical way to extract the garnet and gold minerals from any of the claims is through the use of dredge mining methods. There is no conceivable way that the portions of the claims outside the beds or banks could be mined commercially by other than dredge mining methods. Hydraulicing, ground sluicing or hand mining of these placer deposits would be almost impossible.

Each of the plans to mine the claims proposed by CRM and IMCT, as well as the hypothetical mines considered by defendant's experts and Leo Hurley, provided for dredging operations that were outside the river banks and beds. These dredging operations would have to be separated from the river by dikes, berms, and a complex system of bank protection measures to maintain the river channel. If mined, an extensive road system, including heavy bridges, to haul garnet, equipment and manpower would be required. The free flowing, pristine, and wild characteristics of the St. Joe River would be destroyed by dredging anywhere on plaintiffs' claims. The area would not be pristine after miles of road were constructed to haul tons of garnet. Large equipment such as draglines and suction dredges are not consistent with the concept of a wild and scenic river system. During dredge mining operations, and after the minerals were extracted, the St. Joe would not have the characteristics of a wild and scenic river and its water quality would be substantially altered.

## CONCLUSION

On the basis of the foregoing findings of fact and opinion, plaintiffs' evidence does not establish that a valid discovery had been made on any of the Ruby or Joe claims prior to the withdrawal on October 2, 1968. It necessarily follows that plaintiffs had no property interests that could be the subject of an administrative or a legislative taking. Accordingly, the Clerk is directed to dismiss the complaint. Defendant may have its costs.